**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE BOWEN (B32050), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 16-cv-7310 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JUSTIN HAMMERS, Warden, | ) | |
| Illinois River Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Petitioner Maurice Bowen's petition [1] for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner claims that his trial counsel provided

ineffective assistance by failing to investigate and present the testimony of four alleged alibi

witnesses. For the reasons set forth below, the Court denies Petitioner's habeas corpus petition

and declines to issue a certificate of appealability.

**I.      Background**

**A.      State Court Proceedings**

**1.      Criminal Trial**

On April 24, 1996, following a bench trial in the Circuit Court of Cook County,

Petitioner was found guilty of first degree murder and unlawful use of a weapon by a felon in

connection with the February 28, 1993 shooting and death of thirteen-year-old James Nance.

The trial court sentenced Petitioner to sixty years of imprisonment.

At trial, the State presented the testimony of Lamont Brown and Detective Cliff Gehrke.

Brown, an admitted gang member, testified that he was outside of his apartment on the afternoon

of February 28, 1993 when he saw a Blue Malibu drive by twice. [11-24 Exhibit Y, at D-10];

see also *People v. Bowen*, 699 N.E.2d 1117, 1118 (Ill. App. Ct. 1998). Brown identified the men in the car as Bam, Ricardo, and Maurice, who were members of a rival gang called the Black Disciples. Brown had known these men for "a couple of years." [11-24 Exhibit Y, at D-7–8.] He testified that they looked at him while the car was stopped at a stop sign and then drove away. According to Brown, he went inside his apartment to play with his niece, and from the window of his room, he could see Nance standing outside. He testified that he then saw Maurice get out of the Malibu and shoot Nance. [*Id.* at D-13–14.] However, Brown denied that the Petitioner, who was present in the courtroom during the trial, was the same Maurice as the shooter. [*Id.* at D-8, D-13, D-36.] Rather, Brown explained that he knew Petitioner Maurice Bowen as "Reese" and said that he did not see Maurice the shooter in the courtroom. [*Id.* at D-8, D-19, D-36.] Brown claimed that he knew two people named Maurice who were both in the Black Disciples gang but that he did not know either of their last names. [*Id.* at D-37, D-38, D-42.]

Brown testified that he spoke with Detective Gehrke but denied being shown any photographs. [*Id.* at D-18.] Brown admitted attending a lineup and identifying Petitioner. However, he testified that he did not identify Petitioner as the shooter, but rather identified him as being a member of the Black Disciples. [*Id.* at D-20.] Brown further admitted to signing a handwritten statement prepared by an Assistant State's Attorney summarizing what Brown witnessed and identifying "Maurice" as the shooter. [*Id.* at D-22–23.] According to Brown, when he told a detective that Petitioner was not the shooter, the detective warned him that if he "didn't say it was him they was [sic] going to—I would never see—only way I see my family is behind the glass and they'd drop some of my cases and they'll drop some of my juvenile cases[.]" [*Id.* at D-41–42.] Brown admitted to being in jail in the days preceding his testimony at trial but denied that Petitioner made faces at him and stared at him while he was in a holding

cell and denied telling the prosecutor and her law clerk that Petitioner "had all of his buddies look at [his] face so they could remember [him] if [he] identified him." [*Id.* at D-43.]

The defense impeached Brown by presenting his criminal record and history of delinquency. Brown had an adult conviction for aggravated discharge of a firearm and two adjudications of delinquency for possession of a controlled substance and criminal sexual assault.

The State then presented the testimony of Detective Gehrke. Detective Gehrke testified that he interviewed Brown and that Brown said he witnessed the shooting and gave the names of the offenders. Detective Gehrke stated that he then showed Brown five or six photos, and Brown identified Petitioner as the shooter and they both signed the back of the photo. [*Id.* at D-51.] Detective Gehrke further testified that Brown signed a handwritten statement identifying "Maurice" as the shooter and identified Petitioner as the shooter in a lineup. [*Id.* at D-54, D-56–57.]

The parties stipulated that a few days before trial, Brown was in a holding cell at Cook County Jail, across from the elevator used to transfer prisoners. Petitioner and other inmates walked by and stood in front of Brown's holding cell for approximately one minute while waiting for the elevator. [*Id.* at D-88–89.] The parties further stipulated that a law clerk from the State's Attorney's Office would state, if she were called to testify, that she was present for a conversation between two Assistant State's Attorneys and Brown in which Brown refused to talk to the Assistant State's Attorneys and explained that Petitioner and "all of his buddies" looked at him in the holding cell so that they could remember his face. [*Id.* at D-89]; see also *Bowen*, 699 N.E.2d at 1119–20.

After the prosecution rested, the defense moved for a directed verdict, arguing that Brown's testimony was unreliable. [*Id.* at D-90–93.] The court denied this motion. [*Id.* at D-94.] The defense then called three witnesses to impeach Brown: Brown's sister, Vanessa Brown; his mother, Ruth Brown; and his ex-girlfriend, April Johnson. Petitioner's defense at trial consisted predominantly of testimony impeaching Brown. Brown had testified that Vanessa was across the street at the time of the shooting and that he had looked out the window because she called to him. [11-24 Exhibit Y, at D-33–34.] However, Vanessa testified that she did not call out to anyone prior to the shooting. [*Id.* at D-99.] Additionally, Brown had testified that his window was covered by black plastic and a wooden board but that the board covered only the top of the window. [*Id.* at D-31–32.] Vanessa testified that the window was covered by plastic and that the entire window was covered by a board. She explained that the board was nailed to the window area at the top and bottom, but the sides were not attached, so you could not stick your head out the window, but you could pull the board back a little bit to look out. [*Id.* at D-99–101.]

Brown's mother, Ruth, testified that Brown was at home the day of the shooting but that he left the apartment prior to the shooting. [*Id.* at D-115–16.] However, she also stated that she never went to the police to tell them that Brown was not home at the time of the shooting. [*Id.* at D-123.] She admitted that she had been drinking beer with her daughter, husband, and two friends the evening of the shooting and had not been keeping track of Brown's comings and goings into the apartment. [*Id.* at D-120-121.] Ruth also testified that the plastic covered the bottom part of the window but that "[t]he board covers the whole top. The board is all over that window." [*Id.* at D-124.]

The defense also presented the testimony of April Johnson, who was Brown's girlfriend at the time of the shooting. Johnson testified that she was coming home from a party with Vanessa and two other friends at the time of the shooting and that she did not hear anyone call out to Brown prior to the shooting. [*Id.* at D-134–35.] When asked if she spoke with Detective Gehrke and another detective about the incident, Johnson stated that she recalled speaking with someone but did not know the names of the people she spoke with. She testified that she did not remember telling them that she saw a dark car come down the street or that the offender exited the car and shot the victim. [*Id.* at D-139.]

At the conclusion of the bench trial, the state trial court judge found Petitioner guilty of first degree murder and unlawful use of a weapon by a felon.

### 2. Direct Appeal

On direct appeal, Petitioner argued that (1) the admission of prior inconsistent and unsworn statements as substantive evidence of identification was a denial of his right to due process, (2) the evidence failed to prove the shooter's identity, (3) the court's consideration of his demeanor was reversible error because Petitioner had not testified at trial, and (4) his sixty-year sentence was an abuse of discretion. The Illinois Appellate Court affirmed the trial court on August 14, 1998. On December 2, 1998, the Illinois Supreme Court denied leave to appeal. [1, Appendix B]; *People v. Bowen*, 706 N.E.2d 1106 (Ill. Dec. 2, 1998) (Table).

### 3. Initial Collateral Proceedings

On April 5, 1999, Petitioner filed in the state trial court a *pro se* post-conviction petition alleging that he received ineffective assistance of counsel when his trial counsel, Mike King,

failed to call four alibi witnesses.[1]  [1, at 3.]  Court-appointed counsel filed a supplemental post-conviction petition on October 5, 2007, arguing that: (1) Petitioner was denied effective assistance of trial counsel when counsel failed to call four alibi witnesses at trial, denied Petitioner his right to testify, failed to present mitigating evidence at sentencing, and failed to file a post-sentencing motion to preserve Petitioner's right to appeal his sentence; (2) Petitioner was actually innocent; and (3) Petitioner was denied effective assistance of direct appeal counsel when counsel failed to challenge the trial judge's reliance on mistakes of fact in convicting and failed to challenge improper admonishments post-sentencing.[2]  The petition was supported by affidavits from Petitioner and each of the four alleged alibi witnesses—Ricardo Townsend, his mother Betty Townsend, his brother Willie Townsend, and his aunt Corliss Thomas ("Cora")—all of whom attested that Petitioner was in the Townsend apartment at the time of the shooting and that they were willing to testify to that fact at trial.  In addition, two of the alibi witnesses, Ricardo and Betty, attested that they had provided this information to Petitioner's attorney when they were interviewed prior to trial.  On November 13, 2008, the state trial court granted the State's motion to dismiss Petitioner's post-conviction petition, concluding that Petitioner's affidavits suggested that he discussed defense strategy with his trial counsel and that it would be "inappropriate for the trial court to interject itself in the trial strategy of counsel" "absent some glaring" reason to do so.  [*Id.* at QQ27.]

Petitioner appealed, and on November 22, 2010, the Illinois Appellate Court reversed the dismissal of Petitioner's claim for post-conviction relief based on ineffective assistance of

---

[1] Petitioner also alleged that his trial counsel was ineffective for failing to interview and call one defense witness, denying Petitioner the right to testify and the right to a jury trial, failing to conduct an adequate investigation, and failing to object to evidence and prosecutorial misconduct.  [1, at 3.]

[2] On October 5, 2007, Petitioner also filed in the state trial court a petition for relief from judgment pursuant to Section 2-1401 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-1401.  The court granted the State's motion to dismiss this petition as untimely.

counsel for failure to call alibi witnesses and remanded for an evidentiary hearing. [1, Appendix D, 14–18.] The Illinois Appellate Court explained that "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients, and defense counsel has a professional obligation, both legal and ethical, to explore and investigate a client's alibi defense." [*Id.* at 14.] Further, "strategic decisions may be made only after there has been a thorough investigation of law and facts relevant to plausible options." [*Id.* at 15–16 (citing *Strickland v. Washington*, 466 U.S. 668, 690 S. Ct. (1984)).] The court concluded that although the record indicated that trial counsel interviewed Betty and Ricardo before trial, the same cannot be said of Willie and Corliss Thomas, and the record did not indicate any explanation for counsel's failure to interview these two alibi witnesses.

### 4.      Collateral Proceedings After Remand

On remand, the state trial court held an evidentiary hearing in 2012. [11-12 Exhibit M.] Petitioner presented the testimony of Ricardo Townsend, Betty Townsend, Willie Townsend, and Petitioner himself.[3] The State presented the testimony of Philip Mullane, an attorney who worked with Petitioner's trial counsel on his case, and Detective Gehrke. Petitioner's trial counsel, Mike King, did not testify, as he had passed away in 2004, several years after the conclusion of Petitioner's trial.

Ricardo testified that he and Petitioner were in his bedroom of the Townsend apartment when they heard the gunshots and that nobody else was in the bedroom with them. [*Id.* at V-13–14.] According to Ricardo, after hearing the gunshots, he went outside with Petitioner and Willie to see what was going on. Ricardo further testified that Petitioner's counsel talked to him about the case while he was in custody at the Cook County Jail on an unrelated charge. [*Id.* at V-17, V-33.] He said that he would have been willing to testify at Petitioner's trial and that he

---
[3] The record does not indicate why Corliss Thomas did not testify at the evidentiary hearing.

would have testified consistently with his testimony at the hearing but that he was never asked to testify. [*Id.* at V-20–21.] Ricardo also testified that after learning that Petitioner had been arrested for murder and subsequently convicted, he did not reach out to the police or anyone in law enforcement to tell them that Petitioner could not have been the shooter. [*Id.* at V-45–46.]

Contrary to Ricardo's account, Willie testified that he was also in Ricardo's room with Ricardo and Petitioner at the time of the shooting. [*Id.* at V-59, V-62.] Willie also testified that Ricardo and Petitioner remained in Ricardo's bedroom and only Willie went outside after they heard the gunshots. [*Id.* at V-63.] Although Willie's affidavit stated that he had not been interviewed by Petitioner's trial counsel, Willie testified at the hearing that he was not sure if an attorney for Petitioner spoke with him before Petitioner's trial. [*Id.* at V-61.]

Next, Betty testified that when she heard the gunshots, she was in the living room with Willie and Cora and that Petitioner and Ricardo were in the bedroom. [*Id.* at V-83.] She testified that she told someone representing Petitioner that Petitioner was in her home at the time of the shooting. [*Id.* at V-87.] She explained that she would have been willing to testify at Petitioner's trial and would have testified consistently with her testimony at the hearing. [*Id.*] Betty stated that she thinks of Petitioner as one of her own children. [*Id.* at V-88.] She testified that an attorney told her "I couldn't testify for him because I was his auntie, but we wasn't any kin." [*Id.* at V-92.]

Finally, Petitioner testified that he told his trial counsel that Ricardo, Betty, Willie, and Cora knew that he was in the Townsend apartment during the shooting. He testified that his trial counsel said he thought the State's case was weak and that he would have Brown's family members testify to discredit Brown. Petitioner contended that he asked counsel about Betty and that counsel told him he would call Betty as a witness if Brown's family members did not

discredit him. [*Id.* at V-113–114.] Petitioner denied telling Detective Gehrke that he was with Bam, Rick, or Black the day of the shooting. Petitioner testified that Detective Gehrke asked him when he was last with Terrance Pouncey, who he knows as Bam, and that he told the detective that he had been with Bam the day before the shooting but that he was at Ricardo's apartment the night of the shooting. [*Id.* at V-119.]

At the hearing, the State impeached Ricardo with two convictions for delivery of a controlled substance and convictions for aggravated vehicular hijacking, armed robbery, and possession with intent to deliver. [*Id.* at Z-6.] The State explained that the convictions for aggravated vehicular hijacking, armed robbery, and possession with intent to deliver were convictions that Ricardo had at the time of Petitioner's trial and thus could have been offered as impeachment of him at trial. [*Id.*] The State also impeached Willie with several convictions. At the time of Petitioner's trial, Willie had been convicted of possession of a controlled substance with intent to deliver, aggravated possession of a stolen motor vehicle, possession with intent to deliver, and burglary. [*Id.* at Z-7-8.] At the time of the evidentiary hearing, Willie had also been convicted of theft and robbery. [*Id.* at Z-7.]

The State then presented testimony from Mullane, who was Supervisor of the Homicide Task Force at the Public Defender's office at the time of Petitioner's trial. He worked on Petitioner's case with trial counsel Mike King. [*Id.* at Z-11–12.] King asked Mullane to work on Petitioner's case with him because his cancer was returning and he was not sure he would be able to work on the case for the entire duration. [*Id.* at Z-12.] Mullane testified that King worked on the whole trial but became ill after the verdict and subsequently passed away. [*Id.* at Z-13.] Mullane testified that he had discussions with King about how to handle the case but that King was in charge of the case. [*Id.*] He stated that he did not personally interview witnesses

before trial and that he and King never discussed the alibi witnesses or whether to call them. [*Id.* at Z-20.] According to Mullane, the defense strategy was to attack Brown's credibility and King told Mullane that he thought "the case went in tremendously." [*Id.* at Z-15, Z-19.] Mullane testified that he perceived Brown to be a poor witness for the prosecution and that "[e]veryone in the room" was surprised that Petitioner was not acquitted. [*Id.* at Z-21.]

The State also presented the testimony of Detective Gehrke. Detective Gehrke testified that he interviewed Petitioner while investigating the shooting. According to Detective Gehrke, Petitioner said that on the day of the shooting, he was with Terrence Pouncey, who he called "Bam," Bam's nephew Rick, and someone he knew as "Black." [*Id.* at Z-24.] Detective Gehrke also stated that Petitioner told him they were in Bam's Cadillac and that they went over to see Bam's sister, Darlene Pouncey, and stayed at her apartment for a while. [*Id.*] He testified that Petitioner said that when they "came back to the area of the shooting," they noticed the ambulance taking the victim away, and Petitioner got out of the car to ask a policeman what had happened. [*Id.*] According to Detective Gehrke, Petitioner said that he then went over to Ricardo's apartment. [*Id.*] Detective Gehrke testified that he went to Darlene Pouncey's apartment to investigate Petitioner's alibi and that she was not able to give an alibi for Petitioner. [*Id.* at Z-25.] Detective Gehrke stated that Petitioner never told him that he was at Ricardo's place prior to the shooting and that Petitioner did not mention Willie, Betty, or Corliss Thomas. [*Id.* at Z-26.] On cross-examination, Detective Gehrke testified that he did not take a handwritten or videotaped statement at Petitioner's interview and did not call a court reporter. [*Id.* at Z-28.] However, he testified that a few days after interviewing Petitioner, he typed up a summary in a Supplementary Report, though the summary did not include the exact questions asked nor the verbatim answers given. [*Id.* at Z-28–29.]

In accordance with Detective Gehrke's testimony, the State argued during closing arguments that trial counsel made a strategic decision to pursue a strategy attacking Brown's testimony and emphasizing reasonable doubt. [*Id.* at BB-26.] The State pointed out that trial counsel filed a motion to suppress the statement that Petitioner gave to Detective Gehrke about his original alibi, which was denied. [*Id.* at BB-21.] The State also noted that in opening statements, Mullane shifted the blame for the murder to Ricardo and Bam and argued that they had a motive. [*Id.* at BB-21.] The State contended that it would not have made sense for trial counsel to then call Ricardo as an alibi witness. [*Id.* at BB-24.] Further, according to the State, if the Defense theory was to impeach Brown using his criminal history and gang membership, it would not have made sense to present testimony from Ricardo and Willie, who have the same defects in their credibility. [*Id.* at BB-25.]

On June 7, 2012, after the evidentiary hearing, the state trial court again denied Petitioner's post-conviction petition, concluding that Petitioner was not denied effective assistance of counsel and that his trial counsel made a strategic decision not to call the alibi witnesses. [1, Appendix E.] In so holding, the court gave detailed explanations as to its credibility findings. The court found Ricardo not credible for multiple reasons. The court explained that although Ricardo testified that he considered Petitioner a good friend and that Petitioner was always at Ricardo's home, he claimed that he was unaware when Petitioner was arrested for murder. [*Id.* at CC-9–10.] When he found out Petitioner had been arrested for Nance's murder, Ricardo did not reach out to anyone in law enforcement about Petitioner's alleged alibi. [11-12 Exhibit M, at V-45.] Additionally, Ricardo contradicted his own affidavit, as he testified at the hearing that his father was home at the time of the shooting, [*id.* at V-16, V-40–41], but his affidavit stated that he was at home with his mom Betty, brother Willie, aunt

11

Corliss, and Petitioner, and does not mention his father. [1, Appendix C, at 2.] Further, his testimony was peppered with phrases like "most likely" and "not that I truly recall," he was impeached by numerous felony convictions, and the alibi he gave contradicts Petitioner's alleged statement to Detective Gehrke that he was at Darlene Pouncey's apartment at the time of the shooting. [1, Appendix E. at CC-10.]

The court also found Willie not credible. [*Id.* at CC-12.] At the hearing, Willie testified that he was in Ricardo's bedroom with Ricardo and Petitioner when they heard the gunshots, but this information was not contained in his affidavit, which vaguely states: "When the shots were fired, Maurice Bowen and my brother, Ricardo Townsend, were in a bedroom in the apartment." [1, Appendix C, at 4.] Willie stated in his affidavit that Petitioner's attorney did not interview him or ask him to testify at trial. [*Id.*] However, he testified at the hearing that he was not sure whether or not he spoke with Petitioner's attorney. [1, Appendix E. at CC-11.] Finally, the court noted that he was impeached by numerous felony convictions and that the alibi he gave contradicts the original alibi Petitioner allegedly gave Detective Gehrke. [*Id.* C-11.]

The court then explained that it found Betty not credible. [*Id.* at CC-12.] The court pointed out that Betty said she thinks of Petitioner as one of her own children and that he spent a lot of time at her home, yet she did not reach out to anyone about the alibi after learning that Petitioner had been charged with murder. Additionally, the court noted that Betty and Ricardo gave conflicting testimony. Ricardo testified that after they heard gunshots, his mother Betty knocked on his bedroom door, pushed the door open, and asked if they were in there. [11-12 Exhibit M, at V-40.] However, Betty testified that she did not knock on the door after hearing the gunshots because the bedroom door was open and she could see directly into the bedroom.

[1, Appendix E. at CC-12.] Finally, the court stated that Betty seemed to be ill, perhaps on oxygen, and not able to remember well. [*Id.* at CC-13.]

The court found Petitioner to be credible but also found his testimony "to fly in the face of his claim of ineffective assistance of counsel." [*Id.* at CC-15.] The court believed that Petitioner told trial counsel about his Townsend alibi and that trial counsel said he would interview the proposed alibi witnesses. The court stated:

> It makes sense that Petitioner would give this alibi to Mike King because Petitioner had given a different alibi to Detective Gehrke who checked on it and was unable to verify the earlier alibi with the earlier proposed witness. I think that Attorney King made a strategic decision not to call the alibi witnesses after interviewing them, and frankly, after I observed them at trial and listened to them, I think it was sound trial strategy. I think that the trial strategy, to rely on the State's inability to prove the Petitioner guilty beyond a reasonable doubt and to discredit the State's only eyewitness, Lamont Brown, was a sound trial strategy.

[*Id.* at CC-15–16.] The court then concluded:

> To win relief under a claim of actual innocence, the evidence must be of such conclusive character that it would probably change the result on retrial. Actual innocence is not proven within the rubric of whether a Defendant has been proved guilty beyond a reasonable doubt. Rather, the hallmark of actual innocence means total vindication or exoneration. *** Conclusion, for all of the above reasons, I cannot say that the trial attorneys' failure to call the Townsends and Corliss Thomas was objectively unreasonable. I cannot say that the incredible and contradictory testimony of the alibi witnesses was of such conclusive character that it would probably change the result on retrial. Therefore, respectfully to counsels, the petition for post conviction relief based on actual innocence is denied. *** And just to make the record clear, I did state I specifically found that trial counsel was not ineffective for the reasons stated."

[*Id.* at CC-18–19.]

Petitioner appealed, and the Illinois Appellate Court affirmed the denial of Petitioner's post-conviction relief on June 26, 2015. The Illinois Appellate Court agreed with the state trial court that Petitioner failed to establish that his trial counsel's performance was deficient. [1, Appendix F, at 9.] The court noted that Petitioner and Mullane testified that trial counsel consciously made the strategic choice not to present alibi witnesses. The court explained that

this was sound strategy for several reasons. First, the alibi witnesses likely would have been contradicted by Detective Gehrke's testimony about Petitioner's original alibi involving Bam and Bam's sister, Darlene Pouncy. [*Id.* at 10.] Additionally, the case boiled down to the credibility of the witnesses, and the state trial court found that Ricardo, Betty, and Willie were not credible. Thus, the Illinois Appellate Court concluded that considering the alibi witnesses' lack of credibility, along with the testimony of Detective Gehrke and Mullane, trial counsel's decision not to present the alibi witnesses was sound strategy, and counsel's performance was not deficient.

The Illinois Supreme Court denied leave to appeal on September 30, 2015. Petitioner filed his petition for a writ of habeas corpus in federal court on July 18, 2016. [1.]

## II.     Legal Standard

### A.     Habeas Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, habeas relief cannot be granted unless the state court's decision was contrary to, or involved an unreasonable application of, federal law as determined by the Supreme Court. See *Williams v. Taylor*, 529 U.S. 362, 402–03 (2000); *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013). The Seventh Circuit has stressed that habeas relief is "an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Habeas relief under § 2254 is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–103 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.2 (1979) (Stevens, J., concurring in judgment)). To obtain habeas relief in federal court, "a state petitioner must show

that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Further, the state court's factual findings are presumed correct, and the Petitioner bears the burden of rebutting the state court's factual findings by clear and convincing evidence. § 2254(e)(1); *Toliver v. McCaughtry*, 539 F.3d 766, 772 (7th Cir. 2008).

### B. Ineffective Assistance of Counsel Standard

In order to prevail on an ineffective assistance of counsel claim, Petitioner must show that his counsel's performance was deficient and that he was prejudiced by the deficiencies in counsel's performances. *Strickland v. Washington*, 466 U.S. 688, 687 (1984). Both components of the test must be satisfied or the claim will be denied; "the lack of either is fatal." *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996).

Under the first prong of the *Strickland* test, Petitioner must establish that "counsel's representation fell below an objective standard of reasonableness" when measured against "prevailing professional norms." *Id.* at 688; see also *Gaylord v. United States*, 829 F.3d 500, 506 (7th Cir. 2016). In evaluating counsel's performance, a court must consider "all of the circumstances of [the] case" in determining whether counsel's acts or omissions "were made outside the wide range of professionally competent assistance." *Menzer v. United States*, 200 F.3d 1000, 1003 (7th Cir. 2000) (citing *United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995)). However, review of counsel's performance is "highly deferential," and a court's analysis must begin with a "strong presumption" that the defendant's attorney provided adequate representation to his client. *United States v. Meyer*, 234 F.3d 319, 324–25 (7th Cir. 2000). Petitioner must show that his counsel made "errors so serious that counsel was not functioning as

'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

If a court finds an attorney's representation to be unconstitutionally deficient, it must then proceed to the second prong of the *Strickland* test. Under the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; see also *Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "[c]ounsel's errors must have been 'so serious as to deprive the defendant of a fair trial.'" *Carter v. Butts*, 760 F.3d 631, 635 (7th Cir. 2014) (quoting *Strickland*, 466 U.S. at 693). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 111–12 (citations omitted).

Finally, on habeas review, a petitioner must establish that the state court's application of *Strickland* was "both incorrect and unreasonable—that is, 'lying well outside the boundaries of permissible differences of opinion.'" *Toliver*, 539 F.3d at 774 (quoting *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007)). The Court must apply "a 'doubly deferential' standard of review

that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)); see also *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." (citation and internal quotation marks omitted)).

## III.    Analysis

Petitioner argues that he was deprived of his right to effective assistance of counsel and that in holding otherwise, the Illinois Appellate Court unreasonably applied the *Strickland* test. According to Petitioner, a proper application of *Strickland* in this case would have recognized that it was not a sound decision to not present alibi witnesses without a compelling reason to do so and that such a decision cannot be made without first conducting an adequate investigation into all of the alibi witnesses.

### A.    Procedural Default

As an initial matter, the Court will address the State's argument that Petitioner's claim that trial counsel was deficient for failing to interview Willie Townsend or Corliss Thomas are procedurally defaulted because Petitioner did not "fairly present" them in "one complete round" of state court proceedings.  See *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014) ("To fairly present his federal claim, a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings.").  According to the State, Petitioner failed to raise his claims about Willie Townsend and Corliss Thomas in his post-evidentiary hearing petition for leave to appeal

to Illinois Supreme Court and also failed to raise his claim regarding Thomas in his post-evidentiary hearing appellate brief.

The Court disagrees. The petition for leave to appeal to Illinois Supreme Court specifically details Willie's testimony at the evidentiary hearing, [11-10 Exhibit K, at 9], as well as the state trial court's findings regarding Willie's credibility, [*id.* at 14.] The petition also mentions Ricardo, Willie, and Betty's testimony that Corliss Thomas, or "Auntie Cora," was also at the Townsend apartment at the time of the shooting, [*Id.* at 8, 10, 11], though Thomas did not testify. The petition then refers to "the alibi witnesses" in making petitioner's ineffective assistance of counsel claim, without specifically naming each one of the four witnesses.

Additionally, Petitioner's post-evidentiary hearing appellate brief also raises his argument that his trial counsel was ineffective for failing to call these four alibi witnesses, including Thomas. The brief mentions the "four alibi witnesses" several times, [11-7 Exhibit H, at 11, 13, 28], and names Thomas specifically several times, [*id.* at 12, 16, 18, 19, 20, 30]. This is enough to fairly present petitioner's ineffective assistance of counsel claim.

### B.    Deficient Performance

Since Petitioner's claim is not procedurally defaulted, we turn to the merits of his claim. The relevant decision for purposes of our analysis is the decision of the last state court to rule on the merits of Petitioner's claim—in this case, the June 26, 2015 decision of the Illinois Appellate Court affirming the state trial court's denial of post-conviction relief after the evidentiary hearing. See *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006). Thus, Petitioner's arguments focusing on the decision of the state trial court after the evidentiary hearing are off-base. See *Thomas v. Clements*, 789 F.3d 760, 766 (7th Cir. 2015), cert. denied, 136 S. Ct. (2016) ("Unless a state-court opinion adopts or incorporates the reasoning of a prior opinion, AEDPA generally

requires federal courts to review one state decision." (citing *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012)) (internal quotation marks omitted)).

The Illinois Appellate Court began its analysis by properly identifying the *Strickland* test for ineffective assistance of counsel as the controlling standard. [1, Appendix F, at 9.][4] Petitioner argues that "[t]he Illinois courts ruled contrary to *Strickland* by applying the wrong legal standard to the performance prong." Although Petitioner is correct that the state trial court erred by setting forth the standard for evaluating claims of actual innocence when ruling on Petitioner's ineffective assistance of counsel claim, [1, Appendix E, at CC-18–19], the Illinois Appellate Court addressed this error and found it harmless, [1, Appendix F, at 11.] Because the Illinois Appellate Court's opinion properly set forth the *Strickland* test and is the relevant decision for purposes of our analysis, Petitioner's argument fails. See *Charlton*, 439 F.3d at 374.

Petitioner further contends that the Illinois Appellate Court "mimicked the errors" of the state trial court by adopting the trial court's credibility findings. This argument also misses the mark. It is well established that "[c]ourts of review accord deference to those trial court decisions that are within the special competence of the trial courts *** [such as] credibility determinations." *Pekin Ins. Co. v. Hallmark Homes, L.L.C.*, 912 N.E.2d 250, 254 (Ill. App. Ct. 2009) (quoting *In re Marriage of Rife*, 878 N.E.2d 775, 775 (2007)). Petitioner criticizes the

---

[4] The Illinois Appellate Court stated:

> In order to establish that trial counsel was ineffective, the defendant must satisfy the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). Under this standard, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687. A defendant must satisfy both prongs of the *Strickland* test in order to prevail on a claim of ineffective assistance of counsel; accordingly, if the defendant's claim may be disposed of for failing to satisfy either prong, the court need not address the other prong. *Strickland*, 466 U.S. at 697.

Illinois Appellate Court for relying on *People v. Cochran*, 753 N.E.2d 1155, 1163 (Ill. App. Ct. 2001), arguing that *Cochran* was a direct appeal involving a challenge to the sufficiency of the evidence and thus not applicable to Petitioner's ineffective assistance of counsel claim. This argument is meritless as the Illinois Appellate Court properly cited *Cochran* for the proposition—applicable to both direct appeals and post-conviction appeals—that "[i]t is the responsibility of the trier of fact to determine the credibility of the witnesses, to resolve conflicts or inconsistencies in their testimony, to assess the weight to be given to their testimony, and to draw reasonable inferences from all the evidence." 753 N.E.2d at 1163.

Next, the Court must evaluate whether the Illinois Appellate Court unreasonably applied *Strickland*. Petitioner argues that the Illinois Appellate Court engaged in *post hoc* rationalization for counsel's trial decisions and that the resulting conclusion was directly contradicted by the record. According to Petitioner, the Illinois Appellate Court reasoned that trial counsel decided not to call the alibi witnesses because their testimony that Petitioner was at the Townsend household would have been contradicted by Detective Gehrke's testimony, as stated at the evidentiary hearing, that Petitioner said he was at Darlene Pouncey's apartment with Bam, Rick, and Black at the time of the shooting. [1, at 27–28.] Petitioner contends that this reasoning was directly contradicted by evidence that trial counsel decided not to call the alibi witnesses because he believed the State's evidence was weak and thus thought he did not need the alibi witnesses to win.

The Court is not convinced. Although it is true that "courts may not indulge in *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions," the Supreme Court has also explained that courts may not insist that counsel "confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109 (internal

citation and quotation marks omitted). *Strickland* calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* In the case at hand, there were multiple factors supporting the Illinois Appellate Court's conclusion that trial counsel reasonably decided not to call the alibi witnesses. *Harrington*, 562 U.S. at 105 (explaining that when § 2254(d) applies, the question is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard"). First of all, it is reasonable to conclude that trial counsel made a strategic choice not to present the alibi witnesses and did not simply forget or neglect to present them. Although there is minimal direct evidence as to the strategy behind trial counsel's decision, as trial counsel passed away prior to the evidentiary hearing, Petitioner testified that trial counsel told him that he thought the State's case was weak, and Mullane testified that the defense strategy was to attack Brown's credibility. Thus, it is reasonable to conclude that counsel made a conscious choice to focus on emphasizing reasonable doubt and stuck to that strategy throughout the trial. Petitioner's case is unlike those in which counsel was deficient for priming the finder of fact to hear certain evidence and then failing to follow through. Cf. *Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (concluding that counsel was deficient for putting on a "halfhearted mitigation case" when she primed the jury to hear mitigation evidence in her opening statements but then never followed up on that suggestion); *Harris v. Reed*, 894 F.2d 871, 878–79 (7th Cir. 1990) (concluding that counsel was deficient for failing to call witnesses after preparing the jury for the evidence through his opening).

Although a belief that the prosecution's case is weak is not, in and of itself, enough to justify a decision to refrain from presenting alibi witnesses, see *Harris*, 894 F.2d at 878–79, there are several other reasons supporting the Illinois Appellate Court's conclusion that trial counsel made a sound strategic decision. See *Harrington*, 562 U.S. at 102 (2011) ("Under § 2254(d), a

habeas court must determine what arguments or theories supported or, [ ] could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].").   If trial counsel had presented the testimony of the alibi witnesses, the State would have called Detective Gehrke to testify that Petitioner originally gave a different alibi and that Darlene Pouncey was unable to confirm his original alibi.   This could have cast Petitioner in a negative light and led the finder of fact to wonder why Petitioner gave conflicting alibis and shifted his story.   Trial counsel was aware of the potentially damaging effect of Detective Gehrke's testimony, as he filed a motion to suppress the statement that Petitioner gave to Detective Gehrke about his original alibi.   [11-23, Exhibit X, at C28.]   When the motion to suppress was denied, trial counsel had to make a strategic decision, and he reasonably decided that it was better for Petitioner's case to focus on showing reasonable doubt instead of trying to prove the Townsend alibi with conflicting testimony.   See *Harrington*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt that to strive to prove a certainty that exonerates.").

Petitioner argues that the Illinois Appellate Court unreasonably applied *Strickland* by "simply focus[ing] on whether to believe the alibi witnesses of Detective Gehrke" and thus "fail[ing] to measure the reasonableness of [trial counsel's] performance according to *Strickland*'s explicit instructions."   [1, at 31.]   However, the Illinois Appellate Court did not "simply focus[] on whether to believe the alibi witnesses of Detective Gehrke."   Rather, the court merely noted that Detective Gehrke's testimony would likely have contradicted the testimony of the alibi witnesses and reasoned that this would have factored into trial counsel's decision about whether or not to present the alibi witnesses.

Additionally, Detective Gehrke's contradictory testimony would have made the credibility of the witnesses particularly important. Trial counsel interviewed Betty and Ricardo prior to trial, and assuming their interviews were similar to their testimony at the evidentiary hearing, counsel would have been aware that Betty and Ricardo's stories were incredible and conflicting. This knowledge reasonably would have contributed to counsel's decision not to present them at trial. See *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) ("The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances[.]"). Petitioner challenges the Illinois Appellate Court's adoption of the state trial court's credibility findings from the evidentiary hearing, arguing that the Illinois Appellate Court's decision was based on an unreasonable determination of the facts. [1, at 38.] However, Petitioner does not rebut these credibility findings with clear and convincing evidence. See § 2254(e)(1); *Toliver*, 539 F.3d at 772. Reviewing courts "almost never" disturb credibility findings by trial courts where the trial court judge has an opportunity to observe the witnesses directly. See *Coleman v. Lemke*, 739 F.3d 342, 350 (7th Cir. 2014); *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001) ("[W]e defer to the district court's determination of witness credibility, which can virtually never be clear error."). Here, the state trial court found Ricardo not credible after the evidentiary hearing and gave several reasons for this finding. Ricardo testified that he considered Petitioner a good friend and that Petitioner was always at Ricardo's home, yet he claimed to be unaware when Petitioner was arrested for murder. He claimed to not remember how he discovered that Petitioner had been arrested, and even after he learned of Petitioner's arrest and conviction, he never came forward to tell anyone in law enforcement about Petitioner's alleged alibi. Ricardo's testimony at the hearing contradicted his affidavit as to who else was in the apartment at the time

of the shooting, and his testimony about whether he and Petitioner stayed in his room or went outside after the shooting conflicted with Willie's testimony. Finally, Ricardo's testimony was filled with phrases like "most likely" and "not that I truly recall," and he was impeached by numerous felony convictions.

The court also found Betty not credible after observing her testimony at the evidentiary hearing. The court explained that Betty said she thought of Petitioner as one of her own children and that he spent a lot of time at her house, yet she did not reach out to anyone about this alleged alibi after learning that Petitioner had been charged with murder. Betty's testimony conflicted with Ricardo's testimony as to whether Betty knocked on Ricardo's bedroom door after hearing the gunshots. The court also stated that Betty seemed to be ill and not able to remember well. Petitioner does not rebut these credibility findings with clear and convincing evidence. See *Morales v. Johnson*, 659 F.3d 588, 603–4 (7th Cir. 2011) (acknowledging the deference owed to credibility findings and affirming trial court's credibility determinations based, in part, on alleged alibi witnesses' demeanor, reasonableness of their testimony in light of the other evidence, and any inconsistencies in their testimony). Thus, the Court rejects Petitioner's argument that the Illinois Appellate Court's decision was based on an unreasonable determination of the facts. Given these credibility findings, it was reasonable for the Illinois Appellate Court to conclude that counsel was not deficient in deciding not to present Ricardo's and Betty's testimony at trial.[5] See *Blackmon v. William*, 823 F.3d 1088, 1103 (7th Cir. 2016) (concluding that counsel was not deficient for not calling a potential alibi witness where the alibi witness had been caught lying during the investigation and noting that defense counsel "could

---

[5] Additionally, given that the defense theory was to impeach Brown using his criminal history and gang membership, it would not have made sense to present the testimony of Ricardo and Willie, which suffered from similar credibility issues.

reasonably have concluded that putting [the witness] on the stand would do more harm than good").

Next, Petitioner argues that the Illinois Appellate Court unreasonably failed to analyze whether it was reasonable under prevailing professional norms for trial counsel to only interview Ricardo and Betty once and not to interview Willie and Corliss. This argument fails for several reasons. First, in regard to Ricardo and Betty, *Strickland* does not require trial counsel to interview witnesses multiple times, nor does Petitioner cite any Supreme Court case law dictating that potential alibi witnesses must be interviewed more than once. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (citations omitted). Thus, the Illinois Appellate Court was reasonable in concluding that trial counsel was not deficient since he interviewed Ricardo and Betty and made a strategic decision not to call them at trial based on the relative weakness of the State's case, Detective Gehrke's contradictory testimony, and their own credibility problems, among other reasons. See *Blackmon*, 823 F.3d at 1103 ("If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." (citation and internal quotation marks omitted)).

Nor has Petitioner shown that the Illinois Appellate Court's conclusion was unreasonable as to counsel's treatment of Willie and Corliss. "The Constitution does not oblige counsel to present each and every witness that is suggested to him. Rather, counsel need only investigate possible lines of defense and make an informed decision." *Blackmon*, 823 F.3d at 1103 (citation

and internal quotation marks omitted). Further, "[a]n attorney need not pursue an investigation that would be fruitless[.]" *Harrington*, 562 U.S. at 108. After trial counsel interviewed Betty and Ricardo and found their stories contradictory, trial counsel reasonably could have concluded that investigating Willie and Corliss would be fruitless. See *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable * * * [and] a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Additionally, the record does not clearly indicate that trial counsel did not interview or attempt to interview Willie. Although Willie's affidavit states that trial counsel did not interview him, Willie testified at the evidentiary hearing that he was actually unsure whether or not trial counsel came to speak with him. If trial counsel did interview Willie, counsel would have been aware that Willie's testimony also had credibility problems and contradicted Ricardo's testimony, as the trial court found after the evidentiary hearing. And Willie was dealing with multiple convictions during the time between the shooting in 1993 and Petitioner's trial in 1996 and was incarcerated at the Illinois Department of Corrections at the time of trial, [11-12 Exhibit M, at V-68–69], which could have impeded trial counsel from interviewing him. The record is also unclear about whether counsel interviewed or attempted to interview Corliss. In contrast to Willie's affidavit, which states that trial counsel did not interview him, Corliss's affidavit does not indicate whether or not trial counsel interviewed or attempted to interview her. [1, Appendix C, at 4, 5.] Corliss did not testify at the evidentiary hearing, and the record does not explain her absence.

Further, Ricardo stated in his affidavit that he spoke with Petitioner's attorney in the fall of 1993.[6]  [1, Appendix C, at 3.]  Thus, trial counsel would have had ample time to interview Willie and Corliss before Petitioner's trial in 1996, which supports the conclusion that counsel made a deliberate strategic choice and did not merely neglect to investigate these potential alibi witnesses.  Cf. *Stitts v. Wilson*, 713 F.3d 887, 895 (7th Cir. 2013) (noting that if trial counsel did not speak to the principal alibi witness until the eve of trial, it is reasonable to infer that trial counsel did not interview other potential alibi witnesses).  Thus, the Court concludes that the Illinois Appellate Court was reasonable in determining that trial counsel was not deficient in the way he conducted his investigation of the potential alibi witnesses.  See *Campbell v. Reardon*, 780 F.3d 752, 763 (7th Cir. 2015) (noting that courts apply "a heavy measure of deference to counsel's judgments" in assessing counsel's decision not to investigate (quoting *Strickland*, 466 U.S. at 691) (internal quotation marks omitted)); *Knowles*, 556 U.S. at 123 (noting that the Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success).

Finally, Petitioner argues that since the trial judge had denied his motion for a directed verdict after the prosecution rested and thus "rejected [trial counsel's] defense strategy of attacking the reliability of Brown's eyewitness testimony, it was then objectively unreasonable for [trial counsel] to prioritize continuing with this strategy alone in lieu of calling any alibi witnesses to testify."  [1, at 35.]  However, the state trial court's denial of Petitioner's motion for a directed verdict did not mean that the trial court "rejected" the defense strategy.  Rather, the Seventh Circuit has held that a directed verdict should be denied "where the evidence, along with the inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the

---

[6] Betty's affidavit does not indicate when someone working with trial counsel came to see her.  [See 1, Appendix C, at 1.]

party opposing such motion is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions." *Garrett v. Barnes*, 961 F.2d 629, 631 (7th Cir. 1992) (quoting *McClure v. Cywinski*, 686 F.2d 541, 544 (7th Cir. 1982)) (internal quotation marks omitted). Thus, the denial of Petitioner's motion for a directed verdict merely meant that viewing the evidence in the light most favorable to the State, reasonable minds could disagree about Petitioner's criminal case, and it did not make trial counsel's strategy objectively unreasonable. Accordingly, the Illinois Appellate Court's conclusion that trial counsel's performance was not deficient was reasonable.

In conclusion, given the many reason supporting the Illinois Appellate Court's opinion, the Court concludes that the Illinois Appellate Court's determination that Petitioner's trial counsel was not deficient is reasonable and is not contrary to, or an unreasonable application, of *Strickland* or any other clearly established Supreme Court precedent. See *Harrington*, 562 U.S. at 106 (reversing the court of appeals' holding that the state court could not reasonably have concluded that counsel provided adequate representation and explaining that "[i]t was at least arguable that a reasonable attorney could decide" on the strategy that counsel chose).

### C.      Prejudice

Since the Court has determined that the Illinois Appellate Court reasonably concluded that trial counsel was not deficient, the Court need not analyze prejudice prong of the *Strickland* test. See *Morales*, 659 F.3d at 600 ("We need not address both prongs of the *Strickland* analysis."). However, for the sake of thoroughness, the Court will briefly discuss the issue. The Illinois Appellate Court did not engage in an analysis of the second prong of *Strickland*, which asks whether petitioner has shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Allen*, 555 F.3d

at 600 (quoting *Strickland*, 466 U.S. at 690) (internal quotation marks omitted). Thus, the Court reviews the prejudice question de novo.[7] *Blackmon*, 823 F.3d at 1105.

The Court concludes that Petitioner has not shown that he was prejudiced by trial counsel's alleged errors. If trial counsel has interviewed Willie, he would have learned that Willie's testimony suffered the same credibility issues as Betty's and Ricardo's testimony and thus reasonably could have decided not to call Willie at trial. Additionally, if trial counsel had called the alibi witnesses at trial, the State would have contradicted them with Detective Gehrke's testimony that Petitioner originally gave a different alibi, which Darlene Pouncey was unable to confirm. Detective Gehrke's testimony, if believed by the trier of fact, would have shown that Petitioner shifted his story. Further, trial counsel's attacks on Brown's eyewitness testimony due to his gang membership and multiple convictions may have been less persuasive if trial counsel had presented the testimony of Ricardo and Willie, whose credibility suffered from the same defects. Thus, Petitioner has not carried his burden to show that trial counsel's alleged errors were "so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Harrington*, 562 U.S. at 104 (citation and internal quotation marks omitted); see also *Strickland*, 466 U.S. at 693–94 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. *** A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

In conclusion, Petitioner's ineffective assistance of counsel claim fails both prongs of *Strickland*, and his habeas corpus petition is denied on the merits.

---

[7] The State argues that deferential ADEPA § 2254(d) review should be applied to the prejudice prong because ineffective assistance of counsel is a single claim. See *Carter v. Duncan*, 819 F.3d 931, 950 (7th Cir. 2016) (Easterbrook, J., concurring). However, Seventh Circuit case law requires a piecemeal approach of applying § 2254(d) review when the state court has only ruled on one of the two prongs of the *Strickland* test. See *Thomas v. Clements*, 797 F.3d 445, 446-49 (7th Cir. 2015) (Easterbrook, J., concurring from denial of reh'g en banc).

## IV.     Certificate of Appealability

Per Rule 11(a) of the Rules Governing § 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).  A habeas petitioner does not have an absolute right to appeal a district court's denial of his habeas petition.  Instead, he must first request a certificate of appealability.  See *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009).  A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right.  *Miller-El*, 537 U.S. at 336.  Under this standard, Petitioner must demonstrate that reasonable jurists would find the Court's assessment of his § 2254 claims debatable or wrong.  *Id.; Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In view of the analysis set forth above, the Court concludes that Petitioner has not made a substantial showing that reasonable jurists would differ regarding the merits of his claim.  Thus, the Court declines to issue a certificate of appealability.

## V.     Conclusion

For these reasons, the Court denies Petitioner's habeas corpus petition [1].  The Court declines to certify any issues for appeal under 28 U.S.C. § 2253(c)(2) and directs the Clerk to enter judgment in favor of Respondent.

Dated: January 3, 2017

_____
Robert M. Dow, Jr.
United States District Judge